GULF, C. & S. F. RY. CO. v. NICHOLS et al. (No. 211.)

(Court of Civil Appeals of Texas. Beaumont. Oct. 26, 1917. Rehearing Denied Nov. 14, 1917.)

1. CARRIERS ⬤⟿277(1)—CARRIAGE OF PASSENGERS—BREACH OF CONTRACT—DAMAGES.

For breach of a contract in carrying a passenger beyond his destination, the passenger is entitled to recover damages for his trouble and inconvenience, loss of time, and costs suffered as well as such injury and sickness as results from being wrongfully carried beyond his destination, but the damages recoverable are limited to those which are proximate and not remote or contingent.

2. CARRIERS ⬤⟿277(1)—CARRIAGE OF PASSENGERS—BREACH OF CONTRACT—DAMAGES.

Where a woman with two little children, on being carried a few miles by her station in a country with which she was familiar, became so frightened and excited that her nerves and muscles became completely shattered and incontrollable, resulting in serious illness and physical pain, though she was subjected to no insults, and was not exposed to cold or inclement weather or to any of the usual and natural causes of sickness or mental anguish, but was politely assisted from the train at the next station, taken by the company's agent to a hotel, conducted by a woman whom she knew, and on the following morning was returned free of charge to her station, where another friend assisted her to her home, her injuries were not the proximate result of the conductor's failure to stop the train at her station, as the probability of such serious consequences could not have been anticipated.

Appeal from District Court, Montgomery County; J. Llewellyn, Judge.

Action by Mrs. Sophie Nichols and others against the Gulf, Colorado & Santa Fé Railway Company. Judgment for plaintiffs, and defendant appeals. Reversed and remanded.

W. N. Foster, of Conroe, and F. J. & C. T. Duff, of Beaumont, for appellant. C. A. Toler and Howard Bennette, both of Conroe, for appellees.

KING, J. This suit was tried in the district court of Montgomery county, the plaintiff alleging the following cause of action:

"(9) On or about April 22, 1914, plaintiff, her two little children and a boy about 14 years of age, went aboard defendant's west-bound passenger train at Big Creek, where she contracted with defendant and its agents for passage to Timber and paid to them the fare demanded, whereby defendant became liable and bound to carry her to that place and let her off the train in safety.

"(10) At the time just mentioned, plaintiff's children were 22 and 9 months of age, respectively. She had engaged the boy aforesaid to assist her out home with the children from Timber two miles, which she intended to walk in case the weather would permit; otherwise she intended to stay all night with friends in Timber, and go out home to her father's next morning, either of which she could have done.

"(11) When plaintiff entered the train at Big Creek she was not a strong woman, but was as strong and healthy as was customary for her; she was not an invalid, but was afflicted with a nervous trouble known as shaking palsy that had been bothering her slightly for some time

theretofore; however such disease was not then such as caused her any perceptible physical pain or mental anguish, it being, nevertheless, such a disease of the nerves and muscles as was noticeable to herself and other persons, and such disease as was susceptible of being aggravated by excitement, disappointment, fear, or any other sort of mental worry and anguish, and such disease, when aggravated, as assists to promote mental anguish and physical pain, which disease was grievously aggravated and augmented by the negligence of defendant in the way and manner hereinafter complained of.

"(12) While making the trip from Big Creek to Timber plaintiff relied upon defendant to care for her and put her off the train at Timber according to its contract of carriage, but defendant breached the same, negligently failing to stop its train at that place, and by willfully carrying her on to Waukegan, a station six or eight miles distant from Timber; which breach of contract and wrong committed by defendant, its servants, agents, and employés, directly caused great injury and damage to accrue to plaintiff in the following manner:

"(13) When the train passed Timber without stopping plaintiff knew it, and, not knowing where she would be carried to, and not being able to see any of the trainmen whom she could request to stop the train, and being incumbered with the care of two little children, and being physically diseased as aforesaid, defendant's said negligence and breach of contract caused her to become frightened and so generally excited that her nerves and muscles, in their already weakened condition, then and there became completely shattered and incontrollable, whereby she began to suffer much physical pain and mental anguish before she reached Waukegan, where she was put off the train, among strangers.

"(14) When she was put off the train at Waukegan, plaintiff was so scared, nervous, weak, and in such pain that she fell helpless to the ground while on the way from the depot to her place of lodging, and suffered great physical and mental pain continuously all night without sleep or rest as the direct result of said negligence.

"(15) The next morning plaintiff was transported to Timber free of charge by defendant, and, after reaching Timber, being in her scared and nervous and painful condition still, and being so weak mentally by reason of said excess of nervousness that she was incapable of taking care of herself by sound reason and judgment, and thinking as she did, in a delusion, that she must go home then at once at all hazards, she immediately set out to walk home, and did so.

"(16) Plaintiff went to bed when she reached home, and in a few hours became relieved of physical pain, but her nerves continued to be excited and beyond control to the extent that she could not do anything but lie in bed in a weakened but painless condition for over a week, since which time she has been able to walk about the house, but is not able to care for her children and dress them, which she did with ease before said injury, which injury has permanently augmented said disease.

"(17) After becoming relieved of physical pain, plaintiff nor her father, nor any one else at her home, apprehended that her life or health was in immediate danger; it appearing to her that rest was the principal thing she needed to restore her to her usual health again, wherefore she did not summon medical aid.

"(18) As a direct result of defendant's negligence and breach of contract, plaintiff has suffered in the form and manner above described to her damage $2,500 to recover which this suit is brought."

The jury rendered a verdict in favor of appellee, Sophie Nichols, in the sum of $1,250,

upon which judgment was entered, and from which the railway company appeals.

The trial court charged the jury to assess such damages, if any, as the plaintiff was entitled to recover, in such sum of money as would fairly and justly compensate her for such mental and physical pain and anguish she might have suffered as the direct and proximate result of being carried by her station to the station of Waukegan, and further, that if the jury found from the evidence that plaintiff's nervous complaint was aggravated and her mental and physical suffering was thereby augmented, and that such augmented mental and physical suffering was caused and produced alone by the wrongful act of the defendant in carrying plaintiff beyond her station to the station of Waukegan, she would have been entitled to recover for such augmented suffering, provided that such suffering was produced alone as the direct and proximate result and consequence of the wrongful act of the defendant in carrying plaintiff beyond her station to the station of Waukegan. This charge was objected to upon several grounds, one of the grounds being that it permitted the jury to award damages for mental and physical pain and anguish suffered by plaintiff by reason of being transported beyond the station of Timber, and on to the station of Waukegan, when such damages could not have been, and were not, in the contemplation of the parties at the time the contract of carriage was entered into, as likely to flow from a breach of said contract by so transporting plaintiff by the station of Timber, and because no evidence whatever is described by the record, charging defendant with notice or knowledge that so carrying plaintiff by her station of Timber to Waukegan would probably have the result of causing plaintiff to suffer the acute pain and great excitement and nervous condition as shown by plaintiff's own evidence.

The defendant also requested special charges, among them being one to the effect that the plaintiff was not entitled to recover in this case any damages for mental anguish or suffering occasioned or produced by her anticipation of being carried to unknown points or places, or because, after realizing that she was carried by her point of destination, she was in doubt as to where she would be carried, and by reason of doubts suffered mental anguish and pain, such damage being too remote and of an anticipatory nature, and that the jury should not consider same in arriving at their verdict.

Another special charge requested the court to instruct the jury that there was no evidence in this case of plaintiff having suffered, as the direct and proximate result of the contract of carriage, any injury or damage, except that of being delayed in reaching the point of her destination, and that the jury should, in considering their verdict, only estimate the damages suffered by her by rea-

son of such delay in reaching her point of destination.

The above objection to the court's charge, as well as the refusal of the court to give the special charges above requested, is assigned as error, and we think should be sustained.

The material testimony of the plaintiff in the case is, in substance, as follows:

That on the date alleged she took passage on the passenger train of defendant company from Big Creek to Timber, Tex.; that she got on the train at Big Creek, a flag station, and therefore did not buy a ticket, but paid the money for passage to Timber to the conductor; that it was a night train, and that no one was with her, except her two children, and a boy 14 years of age; that she told the conductor that she wanted to get off at Timber; that the boy was on the train with her to help her with the baby after she got off the train at Timber; that it was two miles in the country from Timber to the place she was going that night. "When I got on the train that night I was afflicted with this disease a little. I was kind of nervous, but wasn't bad. I hardly ever noticed it myself at that time. I was nervous at that time to shake a little, but not much. I was physically able, at that time, to have walked out home that night; I could have toted the baby out home, and I was in good health."

She further testified that the train did not stop at Timber that night, and that she discovered that they had carried her by the station when the train was crossing Caney creek, which is between Waukegan and Timber, and that when she saw they had carried her by Timber, it had a bad effect on her. She said:

"It just frightened me, and I got so nervous I could hardly walk. I had to catch hold of the seats, and the conductor had to help me off the train, and didn't know what to do. I felt so bad, I didn't know what to do, and didn't know nobody."

She stated:

That she did not have any money in her purse that time, not a nickel. That she made an effort to have the train stopped, as follows: "I asked Mr. John Shropshire to see the trainman, and he went off and was gone a few minutes and came back and said he couldn't find the conductor, but found the porter; that the porter said he had no orders to stop the train at Timber." That the porter assisted her to get off. That she went over to the hotel after getting off at Waukegan; that she went in to see the agent about it, and he took her over to the hotel. That she had some trouble in getting over there. That she fell down and hurt her leg. She testified that she never lay down that night. That she was scared to death, and was so nervous that she just sat on the side of the bed all night long. That she did not eat breakfast the next morning. That she went back to the station, assisted by the boy that was with her, and that the railroad company furnished her free transportation back to Timber the next morning. That Mrs. Butler charged her $1 at the hotel for her lodging, and that she did not have a bit of money, and that Mrs. Butler said that she was not running a free hotel, and that Mr. Sprayberry paid the hotel bill, and that her father repaid Sprayberry.

The proof shows that she was carried back to Timber the next morning, free of charge, and that when she got to Timber she met Mr. McCormick, and that he helped the 14 year old boy carry the baby out to her father's house; that she walked from Timber out home, and that it took her until about 11:30 to walk two miles; that they got to Timber after 8 o'clock, and that when she got home she went to bed, because she was sick; that after reaching her father's house, she stayed in bed for about a week, and that her nervous condition was extremely bad; that after she had been there a while she did not suffer any pain, because when she considered that she was at home she got all right, only that she was nervous and just could mope about.

She testified, further, that her physical condition before being carried by her station was such that she could do a big washing and walk a distance of four miles; that she could attend to her children, wash and dress them as good as any woman; that she did the cooking, made up beds, swept floors, etc., but that since making this trip and after going home to bed she hadn't been able to do any washing or ironing, but was barely able to help her mother set the table and sweep the floors and such things as that; that she was not able to attend to her children, and could not even put their clothes on.

The testimony further shows that she was, at the time of the trial, 19 years of age, and that the injury occurred some 2½ years before the date of the trial, and that she was, at the date of her marriage only 12 years 6 months and 7 days old. Plaintiff further testified that the train to Timber at 6 minutes after 8 o'clock at night, and that it was her intention to get off at Timber and go out to her father's house that night, if none of her folks met her and the weather was permissible; that none of her folks knew she was coming home that night; that Waukegan is about four miles from Timber; that she recognized Caney creek when the train was crossing it, because she had been there fishing before, and knew the country all around it; that Mr. Shropshire was the first man to whom she mentioned the fact that she had been carried by; that he was a friend of hers, and had been talking to her on the train; that they got to talking after she got on the train, and that when she saw that she was carried past the station, she told him about it, and asked him to see some of the trainmen; that it was about a mile and a half or two miles from Caney creek, where she discovered that she had been carried by, to Waukegan, where she was put off the train. That it was a mighty few minutes after she so discovered that she had been carried by until they reached Waukegan. Her evidence further shows that she was acquainted with Mrs. Butler, who kept the hotel at Waukegan; that the hotel was about 100 or 200 yards from the depot; that just as soon as she saw Mrs. Butler she knew her; that she had known her pretty nearly all her life, ever since she was a little girl; that Mrs. Butler showed her to her room, and that it was a nice room, and that Mrs.

Butler treated her all right; that she had plenty of room and bedding, and that the room was comfortable, but that Mrs. Butler did not put herself to any trouble to accommodate her, any further than showing her the room and telling her there was the bed.

On cross-examination, she testified further that she was not a strong, healthy woman when she got on the train; that she wasn't a giant, or anything like that, but was tolerably stout, and that she could do her own work all right; that she was in good condition and could do her own work, and was doing it, and everything was all right with her; that any one could have told, however, that she was nervous, if they noticed it, but that she was able to do her own work; that she was afflicted with palsy, and that it first began to appear on her when she was 11 years old; that she was scared so bad, after she found out she had passed Timber, that she couldn't tell how long it took them to go; that what scared her was their taking her by Timber; that she did not know where they would take her, and that she did not have a bit of money; that the worst scare she got was when she found out she had gone by Timber; that it did not come and go, but stayed with her all the time.

We think we are justified in saying that the testimony of Dr. Smith and others shows that excitement would have a tendency to aggravate the disease which the plaintiff testified she was suffering with slightly, and that after plaintiff had reached her father's house she was in a nervous and broken down condition, and remained so for a long time, but that so far as physical pain was concerned, it left her soon after arriving at her father's house.

We do not think that the injuries testified to could be said to be the direct and proximate result of appellant's breach of duty in carrying the appellee by Timber, her destination, to the station of Waukegan. We are aware that ordinarily the question of proximate cause is for the determination of the jury, yet, in view of all the attending circumstances shown in this case, we feel that as a matter of law, in this case, the injuries shown were not such as would be reasonably anticipated to likely or naturally flow from the breach of duty on the part of the conductor in so carrying the appellee by her station, under the circumstances alleged and proven.

[1] For breach of contract in carrying a passenger beyond his destination, the passenger is entitled to recover damages for his trouble and inconvenience, loss of time, and costs suffered, as well as such injury and sickness resulting from being wrongfully carried beyond his destination, but the damages so recoverable are limited to those which are proximate, and not remote or contingent. Texas & Pacific Ry. Co. v. Bigham, 90 Tex. 223, 38 S. W. 162; T. & N. O. v. Wiggins, 156 S. W. 1131; M., K. & T. Ry. Co. v. Welch, 100 Tex. 118, 94 S. W. 333; Railway Co. v. Kellogg, 94 U. S. 469, 24 L. Ed. 256.

The rule is, perhaps, best stated in the last-cited case, in the following language:

"It is generally held that, in order to warrant a finding that negligence, or an act amounting to wanton wrong, is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of attending circumstances."

In Railway Co. v. Welch, above cited, the rule is thus stated:

"The general rule to be applied to this case is that, to sustain the judgment, the injury complained of must be such that, at the time the conductor was guilty of negligent omission, he ought to have foreseen that the necessity to borrow the money or a like injury would probably result. * * * The viewpoint from which the facts must be considered is the time when the conductor acted. Standing in the place of the conductor when he failed to give the slip to authorize the next conductor to transport Mrs. Welch to Kansas City, could one reasonably anticipate that upon being refused a continuous passage, Mrs. Welch would be under the necessity of borrowing money from some other person? There is nothing in the facts to suggest such a contingency. Looking back at a state of facts which have transpired, one can see a connection between the consequence and the original cause which would not appear from a most careful consideration of the matter when the first act occurred."

[2] Under the testimony, we have a case where the mere carrying of a woman, with her two little children, by her station, in a country that she was familiar with, with a man friend talking to her on the seat when the discovery was made that she had been carried by, became so frightened and generally excited that her nerves and muscles became completely shattered and incontrollable, resulting in serious illness and physical pain, in the absence of any insults or exposure to cold or inclement weather, or any of the usual and natural causes of sickness and mental anguish, but simply that, upon the realization of being carried by her station, she became so nervous and excited that she suffered great mental anguish and bodily pain as testified to by her and others.

It is disclosed by the evidence that she was with a friend; that she was carried only about four miles, and was kindly and politely assisted off of the train, and escorted to the hotel by the company's agent at Waukegan; that there she was placed in a hotel with a woman that she had known all her life, who gave her a nice, comfortable room; that she was returned free of charge to the station of Timber, the next morning, where she met another friend of hers, who assisted her out to her father's home; and that she walked a distance of two miles next morning from Timber to her father's home. Can it be said that the injuries claimed were the direct and proximate result of the conductor's breach of duty? In other words, applying the rule as above set out in this opinion, would it be reasonable to hold that at the time the conductor collected the pas-

sage from this woman he could have reasonably anticipated that the mere failure to put her off at her station, under all the attending circumstances, would result in the shattering of her nerves, and that she would be reduced to an invalid from this fact alone? We think that nothing short of prophetic ken upon the part of the conductor could have revealed to him at that time the probability that any such serious consequence would flow from his failure to stop the train at Timber and allow the plaintiff to disembark. We think the damages claimed are too remote, and are not the direct and proximate result of the conductor's negligence.

We are also of the opinion that appellant's first assignment of error, complaining of the court in overruling its special exception to the plaintiff's petition, because the damages sought to be recovered were too remote, and are not shown to have been the proximate cause of the alleged injuries, should be sustained.

For the errors pointed out, the cause is reversed and remanded.

---

⬦For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes